**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARYKATE ELLINGSWORTH** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| | : | |
| **HARTFORD FIRE INSURANCE** | : | **NO. 16-3187** |
| **COMPANY, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**M E M O R A N D U M**

STENGEL, J.                                     March 22, 2017

## I.    INTRODUCTION

This case involves sexual orientation and gender stereotyping Title VII claims. Marykate Ellingsworth, the plaintiff, claims she was discriminated against and harassed because of the way she dressed, her appearance, style, and perceived (by co-workers) sexual orientation.

Ms. Ellingsworth filed a complaint against her former employer, alleging sexual harassment, gender discrimination, and retaliation in violation of Title VII of the Civil Rights Act (Title VII) and the Pennsylvania Human Relations Act (PHRA). The defendant filed a motion to dismiss. I will deny the defendant's motion.

## II.     BACKGROUND[1]

Marykate Ellingsworth lives with her husband in Allentown, Pennsylvania. Five years ago, on March 26, 2012, Ms. Ellingsworth was hired by The Hartford (an insurance company) as a customer service representative. After completing her initial training, Ms. Ellingsworth was placed on a work team supervised by Angela Ferrier.

Ms. Ferrier allegedly harassed Ms. Ellingsworth in various ways over the span of approximately one year. Ferrier would tell Ellingsworth that she "dresses like a dyke." Ferrier would also make fun of Ellingsworth's clothing, call her "stupid," and tell her that she "sucks." In addition to ridiculing Ms. Ellingsworth directly, Ms. Ferrier would also tell her coworkers that Ellingsworth "dresses like a dyke" and has a "lesbian tattoo." At times, Ferrier would force Ellingsworth to show her tattoo to coworkers and then ask those coworkers whether they thought it was a "lesbian tattoo." Ferrier went so far as to tell Ellingsworth's coworkers that Ellingsworth was a lesbian. These remarks were made in private to Ms. Ellingsworth and also, at other times, in front of coworkers.

Because of this persistent harassment, Ellingsworth's coworkers began to adopt the belief that Ellingsworth was gay, even though she is not. Eventually, it became "generally accepted" in the workplace that Ellingsworth was gay. Ellingsworth felt compelled to explain to her coworkers that she was not a lesbian. This situation began to exacerbate Ellingsworth's pre-existing depression and anxiety.

---

[1] Because this is a motion to dismiss for failure to state a claim, I will "accept all [plaintiff's] factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." Bruni v. City of Pittsburgh, 824 F.3d 353, 360 (3d Cir. 2016). However, my acceptance of all allegations as true does not apply to "legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

On May 8, 2013, Ms. Ellingsworth complained to one of her supervisors, Laurie Kumnick, about Ferrier's harassment. Ellingsworth made two statements about the harassment on two separate days. Several weeks later, Ellingsworth received a letter from one of The Hartford's Employee Relations Investigators stating:

> I write to follow-up on the concerns you raised during our discussion on May 13th and 14th. I would like to thank you for bringing your concerns to The Hartford's attention, as it takes such concerns very seriously. I conducted a thorough investigation based on the information you shared. The Hartford has completed its investigation and has taken appropriate action. Accordingly, The Hartford considers this investigation closed.

Ellingsworth does not know what action was taken by The Hartford and she received no further communication or information regarding her complaints.

Ferrier continued to work as Ellingsworth's supervisor. In July 2013, Ferrier went on maternity leave. She returned to The Hartford and began working again in November 2013. Ellingsworth claims that her anxiety and depression were exacerbated by Ferrier's return.

Due to her anxiety and depression, Ellingsworth took a leave of absence beginning January 6, 2014. On March 24, 2014, The Hartford wrote her a letter stating that she could either return to work or be terminated. Believing that nothing would be done to resolve the harassment, Ms. Ellingsworth was unable to return to work. She claims she was constructively discharged. Two months later, on May 23, 2014, Ms. Ellingsworth filed an administrative complaint with the Pennsylvania Human Relations Committee ("PHRC"). This complaint was cross-filed with the EEOC on or after that date.

## III.   LEGAL STANDARD

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  Subsequently, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court defined a two-pronged approach to a court's review of a motion to dismiss.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  Thus, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir.

4

2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

The basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations.  Phillips, 515 F.3d at 233.  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## IV.   DISCUSSION

The defendant moves to dismiss plaintiff's complaint on two grounds. First, defendant moves pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Second, defendant argues the plaintiff's claims are untimely.

### A.    *Failure to State A Claim*

The defendant argues plaintiff has failed to state a claim for relief because Title VII does not prohibit discrimination based on sexual orientation.[2] Because Title VII prohibits gender stereotyping and discrimination "because of sex," defendant's argument lacks merit. Accordingly, I will deny the motion to dismiss plaintiff's disparate treatment and hostile work environment claims.

### 1.    <u>Gender Stereotyping and "Because of Sex" Discrimination</u>

The pertinent section of Title VII provides: "It shall be unlawful . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). At issue here is what it means for an employer to discriminate against one of its employees "because of" that employee's "sex."

Over the years, the United States Supreme Court has taken an increasingly broad view of Title VII's "because of sex" language. <u>See</u> <u>EEOC v. Scott Med. Health Ctr.</u>, --- F. Supp. 3d ----, 2016 WL 6569233, at *5 (W.D. Pa. 2016) (collecting cases). Most notable for purposes of this case, the Supreme Court has held that Title VII's "because of sex" language prohibits discrimination based upon employers' subjectively held gender stereotypes. <u>Prowel v. Wise Bus. Forms, Inc.</u>, 579 F.3d 285, 286–87 (3d Cir. 2009)

---

[2] In the same vein, the defendant argues Title VII does not prohibit discrimination based upon "perceived" sexual orientation.

(<u>citing</u> <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989)).[3] Courts have since

recognized a wide variety of "gender stereotyping" claims. <u>See</u>, <u>e.g.</u>, <u>Prowel</u>, 579 F.3d at

291 (reversing summary judgment on male employee's gender stereotyping claim

because issue of fact existed as to whether he was harassed for having a high-pitched

voice, walking effeminately, and wearing feminine clothing); <u>Price Waterhouse</u>, 490 U.S.

at 250 ("[A]n employer who acts on the basis or a belief that a woman cannot be

aggressive, or that she must not be, has acted on the basis of gender."); <u>Scott</u>, --- F. Supp.

3d ----, 2016 WL 6569233, at *6 ("There is no more obvious form of sex stereotyping

than making a determination that a person should conform to heterosexuality."); <u>Thomas

v. Keystone Real Estate Grp. LP</u>, No. 4:14–CV–543, 2015 WL 1471273 (M.D. Pa. Mar.

31, 2015) (denying motion to dismiss female employee's gender stereotyping claim

because employer allegedly failed to promote her for not walking, talking, or dressing

femininely, or wearing make-up or jewelry).

 <u>Price Waterhouse v. Hopkins</u>, is the seminal case regarding Title VII gender

stereotyping claims. 490 U.S. 228 (1989). There, the U.S. Supreme Court held that

evidence of an employer's gender stereotyping could show that a female employee was

refused a promotion "because of" her "sex." <u>Price Waterhouse</u>, 490 U.S. at 235, 250–51.

More specifically, the Court pointed to evidence that the female employee was viewed as

"macho," not feminine enough, and told to "take a course in charm school." <u>Id.</u> at 235. In

reversing summary judgment, the Court noted, "[i]n the specific context of sex

---

[3] Such claims have come to be commonly known as a "gender stereotyping" claims. <u>Prowel</u>, 579
F.3d at 286–87.

stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." Id. at 250. The U.S. Court of Appeals for the Third Circuit has taken Price Waterhouse as holding: "Title VII prohibits discrimination against women for failing to conform to a traditionally feminine demeanor and appearance." Prowel, 579 F.3d at 290.

The defendant relies heavily on Bibby v. Philadelphia Coca Cola Bottling Co., where the Third Circuit held: "It is clear . . . that Title VII does not prohibit discrimination based on sexual orientation." 260 F.3d 257, 261 (3d Cir. 2001). In that case, John Bibby, a gay man, was employed by Coca Cola. Bibby, 260 F.3d at 259. Bibby filed a complaint against Coca Cola, alleging he was harassed in violation of Title VII because he was gay. Id. at 264. The Third Circuit affirmed the district court's entry of summary judgment in favor of the employer. Id. It did so on the basis that Bibby offered "nothing that would support" the conclusion that he was discriminated against because of his sex. Id. In other words, Bibby presented insufficient evidence from which a reasonable jury could conclude that Bibby's harassment was because of his gender.

Since Bibby, the Third Circuit has distinguished between Title VII claims based upon gender stereotyping and Title VII claims based upon sexual orientation. In Prowel v. Wise Business Forms, Inc., Judge Hardiman applied this distinction in allowing a self-described "effeminate man['s]" gender stereotyping claim to proceed beyond summary judgment. 579 F.3d at 286–87. In doing so, Judge Hardiman emphasized that "the line between sexual orientation discrimination and discrimination 'because of sex' can be difficult to draw." Id. at 291. After evaluating the evidence presented at summary

judgment, Judge Hardiman conceded, "it is possible that the harassment Prowel alleges was because of his sexual orientation, not his effeminacy." Id. at 292. "Nevertheless," Judge Hardiman held, "this does not vitiate the possibility that Prowel was also harassed for his failure to conform to gender stereotypes." Id. These competing possibilities, the Third Circuit concluded, presented a triable issue for the jury. Id. Thus, it vacated the district court's entry of summary judgment. Id. at 293.

Recently, relying on Bibby, Prowell, and Price Waterhouse, Judge Bissoon, in the Western District of Pennsylvania, denied an employer's motion to dismiss a gay man's Title VII claim that he was constructively discharged due to an allegedly hostile work environment. Scott, 2016 WL 6569233, at *1, 4–8. Judge Bissoon held that "Title VII's 'because of sex' provision prohibits discrimination on the basis of sexual orientation" because "[t]here is no more obvious form of sex stereotyping than making a determination that a person should conform to heterosexuality." Id. at *5–6. Critical to Judge Bissoon's decision was the idea that "gender stereotyping" necessarily encompasses employers' views on the propriety of one's sexual preference or appearance as a man or woman: "That someone can be subjected to a barrage of insults, humiliation, hostility and/or changes to the terms and conditions of their employment, based upon nothing more than the aggressor's view of *what it means to be a man or a woman*, is exactly the evil Title VII was designed to eradicate." Id. at *7 (emphasis added).

Against this backdrop, I must now consider whether Ms. Ellingsworth has stated a plausible claim for relief.

2.   **Gender Stereotyping Analysis**

Ms. Ellingsworth's complaint presents a plausible claim that she was discriminated against "because of sex." The complaint clearly shows that Ms. Ellingsworth did not fit her employer's view of what it means to be a woman. Even though she identifies as heterosexual, Ms. Ellingsworth was repeatedly called a "dyke" in front of her coworkers because of how she dressed and looked. Apparently, Ms. Ellingsworth's "lesbian tattoo" was not acceptable to her supervisor because Ms. Ferrier constantly ridiculed Ms. Ellingsworth for the tattoo. In fact, according to the complaint, Ms. Ferrier went so far as to make a spectacle out of Ms. Ellingsworth's perceived lack of effeminacy. See Compl. ¶14(f) (alleging Ms. Ferrier "badger[ed] Plaintiff to show her tattoo, which is hidden, to co-workers and then either stat[ed] it is a 'lesbian tattoo' or ask[ed] others to give an opinion of whether or not it is a 'lesbian tattoo.'"). Faced with this constant harassment, Ms. Ellingsworth was put in a position where she actually had to "explain to co-workers she was not a lesbian" because it "had become generally accepted" that she was gay. (Compl. ¶ 18).

The above allegations are the precise sort of "gender stereotyping" that is prohibited by Title VII and Price Waterhouse. Ms. Ellingsworth alleges she was harassed because of her masculine—according to Ms. Ferrier—tattoo, how she dressed, how she looked, and how she presented herself as a woman. Such conduct is clearly proscribed by Title VII. See Prowell, 579 F.3d at 290 ("Title VII prohibits discrimination against women for failing to conform to a traditionally feminine demeanor and appearance.");

Price Waterhouse, 490 U.S. at 250; Scott, 2016 WL 6569233, at *7–8; Thomas, 2015 WL 1471273, at *2.

The fact that Ms. Ellingsworth does not identify as gay does nothing to weaken the plausibility of her claim. According to defendant, it cannot be liable under Title VII because Ms. Ferrier's "perception" of Ms. Ellingsworth's sexual preference (*i.e.* that she was gay) was not correct.[4] While defendant correctly points out that Bibby precludes Title VII's application to pure claims of sexual orientation discrimination, defendant ignores the true nature of the alleged discrimination complained of in this case.

Calling a female employee a "dyke," ridiculing her publicly for "dressing like a dyke," and forcing her to peel back her clothing to show her coworkers her "lesbian tattoo" is not only offensive and inappropriate—it is prohibited by Title VII. This is the case regardless of whether or not Ms. Ellingsworth is or is not actually gay.[5] The fact of the matter is this: the complaint clearly conveys that Ms. Ellingsworth did not conform to Ms. Ferrier's idea of how a woman should look, act, or dress. Ms. Ferrier was her supervisor and her bias determined the conditions of Ms. Ellingsworth's employment. As a woman, Ms. Ellingsworth is necessarily a member of a protected class. According to the complaint, even after plaintiff placed her employer on notice, nothing was done.

---

[4] In support of this particular contention, defendant cites to several unreported federal district court cases from North Carolina and Tennessee. Defendant does not cite to any Third Circuit opinion or district court opinion within the Third Circuit.

[5] Defendant's ultra-hyper focus on Ms. Ellingsworth's sexual orientation ignores the broader impact of Title VII's "because of sex" language. As explained by Judge Hardiman, "[a]s long as the employee—*regardless of his or her sexual orientation*—marshals sufficient evidence such that a reasonable jury could conclude that harassment or discrimination occurred 'because of sex,' the case is not appropriate for summary judgment." Prowel, 579 F.3d at 292 (emphasis added).

The alleged harassment and discrimination in this case is analogous to the harassment recognized in other viable gender stereotyping cases. See, e.g., Price Waterhouse, 490 U.S. at 235 (woman perceived as "macho," not being feminine enough, and needing a "course in charm school"); Prowel, 579 F.3d at 291 (man harassed for wearing feminine clothing, having a high-pitched voice, and walking effeminately); Scott, 2016 WL 6569233, at *6 ("Forcing an employee to fit into a gendered expectation—whether that expectation involves physical traits, clothing, mannerisms or sexual attraction—constitutes sex stereotyping and, under Price Waterhouse, violates Title VII."). Indeed, Ms. Ferrier's alleged comments and criticisms present a textbook example of gender stereotyping in that, according to Ms. Ferrier, Ms. Ellingsworth "fail[ed] to conform to a traditionally feminine demeanor and appearance." Prowel, 579 F.3d at 290. Accordingly, Ms. Ellingsworth has presented a plausible claim that she was discriminated against and harassed because of her sex.

To be sure, it is perhaps worse (for defendant's case) that Ms. Ferrier was mistaken in her assumption that Ms. Ellingsworth is gay. The fact that Ms. Ellingsworth is not gay simply reveals that Ms. Ferrier harbored such a strong prejudice and animus as to how women should look, dress, and act, that Ms. Ferrier actually mischaracterized another person's sexual orientation because of this prejudice. Clearly, Ms. Ferrier's animus and pre-conveived gender stereotyping played a role in her treatment of Ms. Ellingsworth. Otherwise, Ms. Ferrier presumably would not have berated Ms.

Ellingsworth in front of her coworkers, called her a "dyke," and forced her to reveal her "lesbian tattoo."[6]

The procedural posture of this case further supports my decision. Both <u>Bibby</u> and <u>Prowel</u> involved district courts' determinations made at the summary judgment stage. Thus, the question in both of those cases was: did the plaintiff bring forth sufficient evidence from which a reasonable jury could conclude the plaintiff was discriminated against because of his or her sex? It was only after the pleadings stage, discovery, and examination of evidence, that the district courts reached their respective conclusions on this issue. Here, by contrast, I am presented with a motion to dismiss. At this early stage, I must only "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Pinkerton</u>, 292 F.3d at 374 n.7. At this juncture, I am convinced that, based upon a reasonable reading of the complaint, plaintiff sets forth a plausible claim that she was discriminated against because of her sex.[7]

---

[6] I am, of course, assuming these allegations are true, which I must do when considering a motion to dismiss.

[7] The gist of defendant's argument mistakes the forest for the trees. Defendant attempts to pigeonhole Ms. Ellingsworth into claiming either gender stereotyping or sexual orientation discrimination. However, as the Third Circuit has repeatedly cautioned, "the line between sexual orientation discrimination and discrimination 'because of sex' can be difficult to draw." <u>Prowell</u>, 579 F.3d at 291; <u>see also</u> <u>Kay v. Independence Blue Cross</u>, 142 F. App'x 48, 51 (3d Cir. 2005) (Rendell, J., concurring) ("The line between discrimination based upon gender stereotyping and that based upon sexual orientation is difficult to draw and in this case some of the complained of conduct arguably fits within both rubrics."). Defendant's argument as to Ms. Ellingsworth's protected status also misses the mark. While Ms. Ellingsworth does claim she was discriminated against based on her employer's "perception" she was gay, the complaint is nonetheless clear that Ms. Ellingsworth is a woman. The complaint is also clear that, because she is a woman, her style of dress, tattoo, and appearance was not acceptable to her employer. The fact that Ms. Ferrier improperly "perceived" Ms. Ellingsworth as being gay only strengthens this point. Taken together, the factual allegations contained in the complaint are sufficient to make out a claim that Ms. Ellingsworth was harassed or discriminated against because of her sex.

For all these reasons, I will deny defendant's motion to dismiss plaintiff's Title VII discrimination and harassment claims pursuant to Rule 12(b)(6) for failure to state a claim.[8]

### 3.   <u>Retaliation</u>

To make out a *prima facie* case of retaliation under Title VII, the plaintiff must demonstrate: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. <u>Moore v. City of Phila.</u>, 461 F.3d 331, 340–41 (3d Cir. 2006). Defendant challenges plaintiff's claim at each of these three elements.

### a.   *Protected Activity*

Defendant contends that plaintiff never engaged in "protected activity" because plaintiff complained of sexual orientation discrimination, which is not a type of discrimination prohibited by Title VII. For the reasons already discussed, defendant is incorrect.

"With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." <u>Moore</u>, 461 F.3d at 341. An employee engages in protected activity by complaining to his or her employer about conduct that is prohibited by Title VII.

---

[8] The same analysis applies to Title VII and PHRA claims. <u>Wilkerson v. New Media Tech. Charter Sch. Inc.</u>, 522 F.3d 315, 318–19 (3d Cir. 2008). Accordingly, I will also deny defendant's motion to dismiss plaintiff's PHRA claims for harassment and discrimination.

Connelly v. Lane Const. Corp., 809 F.3d 780, 792 (3d Cir. 2016). The employee must have a reasonable, good faith, belief that the complained of conduct violates Title VII. Moore, 461 F.3d at 341.

Ms. Ellingsworth's complaint sufficiently alleges she engaged in protected activity. The complaint alleges that on May 8, 2013, plaintiff made a complaint to her supervisor about Ms. Ferrier's mistreatment and harassment of plaintiff. I have already held that this mistreatment and harassment constituted gender stereotyping in violation of Title VII.[9] Accordingly, Ms. Ellingsworth engaged in protected activity.

### b.    Adverse Employment Action

Plaintiff claims that she was "constructively discharged." A constructive discharge constitutes an "adverse employment action" for purposes of Title VII—if proven, it is the legal equivalent of being terminated. Price v. Del. Dep't of Corr., 40 F. Supp. 2d 544, 552–53 (D. Del. 1999) (citing Sheridan v. E.I. DuPont de Nemours & Co., 957 F.2d 1070, 1079 (3d Cir. 1992)). To determine if there has been a constructive discharge, courts analyze whether "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996). This is an

---

[9] Defendant renews its argument that sexual orientation discrimination is not prohibited by Title VII. Therefore, according to defendant, complaining about sexual orientation discrimination is not "protected activity" under Title VII. I will reject this argument for the same reasons I did above. Ms. Ellingsworth's complaint clearly alleges gender stereotyping and that Ms. Ellingsworth was discriminated against and harassed because of her sex. Because such conduct is prohibited by Title VII, see Prowel, 579 F.3d at 291, complaining about it therefore constitutes protected activity under Title VII.

objective standard. <u>Spencer v. Wal-Mart Stores, Inc.</u>, 469 F.3d 311, 316 n.4 (3d Cir. 2006).[10]

Viewing the allegations in plaintiff's complaint as true, I find that Ms. Ellingsworth has adequately alleged a constructive discharge. Over a one-year span, Ms. Ellingsworth alleges she was repeatedly called a "dyke," her clothing was made fun of, and told she had a "lesbian tattoo." Plaintiff alleges that she broke down in tears as a result of this harassment. Plaintiff does not only allege that Ms. Ferrier directly harassed her. In addition, plaintiff alleges Ms. Ferrier would call her a "dyke" in front of her coworkers and even make the coworkers comment on whether they agreed that plaintiff had a "lesbian tattoo." Plaintiff alleges that, even after she complained about Ms. Ferrier's conduct, the two continued to work on the same team in the same area. (Compl. ¶¶ 26–28). Indeed, the defendant sent plaintiff a letter threatening termination. <u>See Mandel v. M & Q Pack. Corp.</u>, 706 F.3d 157, 169–70 (3d Cir. 2013) (noting that an employee being "threatened with discharge" may support a finding of constructive discharge). All of this left plaintiff depressed and anxious.

I am satisfied that this alleged conduct may be so intolerable that a reasonable person in Ms. Ellingsworth's shoes would have been forced to resign. No reasonable

---

[10] Constructive discharge has sometimes been treated as a type of "claim" under Title VII. On the other hand, a constructive discharge is sometimes treated merely as a means of proving the element of "adverse employment action" for purposes of making out a *prima facie* case of retaliation. <u>Ilori v. Carnegie Melon Univ.</u>, 742 F. Supp. 2d 734, 738 n.1 (W.D. Pa. 2010). Either way, by proving a constructive discharge, the plaintiff necessarily proves an adverse employment action occurred. <u>Id.</u>; <u>see also</u> <u>Green v. Brennan</u>, 136 S. Ct. 1769, 1776 (2016) ("[T]he 'matter alleged to be discriminatory' in a constructive-discharge claim necessarily includes the employee's resignation"). At least in the context of retaliation claims, plaintiffs may satisfy the adverse employment action element by pleading a constructive discharge. <u>LaRochelle v. Wilmac Corp.</u>, --- F. Supp. 3d ----, 2016 WL 5404474, at *28–29 (E.D. Pa. 2016).

employee can be expected to tolerate (i) repeatedly being called a "dyke," (ii) having to continually clarify one's own sexual orientation in the workplace, and (iii) being ridiculed for having a "lesbian tattoo." Defendant contends plaintiff stopped working nearly a year after the alleged "last" comment was made by Ms. Ferrier. However, the complaint does not support this argument; it does not allege any specific date upon which Ms. Ferrier made her "last" comment. I am similarly unmoved by defendant's argument that the work environment could not have been abusive for Ms. Ellingsworth in March 2014 because she was not working then. This argument ignores plaintiff's allegation that she was not working specifically *because of* how severely Ms. Ferrier's harassment had affected her.

For all these reasons, plaintiff has adequately pled a constructive discharge. Accordingly, she has satisfied the *prima facie* element of an adverse employment action.

### c.    *Causal Connection*

Defendant finally argues there is no causal connection between plaintiff's protected activity and the adverse employment action. Contrary to defendant's argument, I find that plaintiff has sufficiently pled a causal connection.

"[A] plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him." Marra v. Phila. Housing Auth., 497 F.3d 286, 302 (3d Cir. 2007) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000)). In some scenarios, an unusually suggestive proximity in time between the protected activity and adverse employment action may establish this element. Id. Where there is no unusually suggestive temporal proximity,

17

courts look to "the intervening period for . . . circumstantial evidence . . . that give[s] rise to an inference of causation when considered as a whole." Id. (citations omitted).

Plaintiff has alleged facts sufficient to demonstrate a causal connection between her protected activity and adverse employment action. Although plaintiff's constructive discharge occurred approximately ten months following the complaint to her supervisor, plaintiff alleges that defendant failed to take action immediately following her May 2013 complaints, thereby permitting hostility within the workplace to continue.[11]  In the intervening period between plaintiff's protected activity and constructive discharge, plaintiff alleges that, despite complaining about Ms. Ferrier's harassment and discrimination, Ms. Ferrier remained her supervisor. Plaintiff also alleges that nothing was done to remedy the harassment and she remained only a few cubicles away from Ms. Ferrier. One could reasonably infer that plaintiff's protected activity contributed to her constructive discharge because she did not believe her employer took her complaints seriously or did anything to curb Ms. Ferrier's harassment. Also during this intervening period, defendant sent plaintiff a letter threatening to fire her if she did not return to work. Taken as true, the above allegations could give rise to an inference of causation.

The temporal proximity between plaintiff's protected activity and constructive discharge is not, in itself, unduly suggestive. Marra, 497 F.3d at 302. Nonetheless, when considering the intervening period as a whole, the allegations in plaintiff's complaint present an overall inference of causation sufficient to withstand a motion to dismiss. Id.

---

[11] Despite the Third Circuit's holding that plaintiffs may rely on a broad array of evidence to demonstrate a causal link, defendant focuses only on the temporal proximity between plaintiff's last day of work and her May 2013 complaint. In doing so, defendant ignores the intervening period of time following plaintiff's complaint and leading up to her termination.

For all the foregoing reasons, I will deny defendant's motion to dismiss plaintiff's retaliation claim.[12]

### B.    *Timeliness*

#### 1.    Timeliness of the Discrimination Claim

Defendant argues plaintiff's discrimination claim is untimely. Defendant is incorrect.

To file suit under the PHRA, a plaintiff must first file an administrative complaint with the PHRC within 180 days of the alleged act of discrimination. Mandel, 706 F.3d at 164. To bring suit under Title VII, a plaintiff must first file an administrative charge with the EEOC within 300 days of the alleged unlawful employment practice. Id. "[W]hen a plaintiff dual files with the EEOC and the PHRC, the complaint will be deemed filed with both agencies on the date the election to dual file the charge is made." Yeager v. UPMC Horizon, 698 F. Supp. 2d 523, 537 (W.D. Pa. 2010); Berkoski v. Ashland Reg'l Med. Ctr., 951 F. Supp. 544, 548–50 (M.D. Pa. 1997), aff'd, 205 F.3d 1328 (3d Cir. 1999).[13]

Discrete acts of discrimination include "termination, failure to promote, denial of transfer, or refusal to hire." Mandel, 706 F.3d at 165 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)). A discrete act, in itself, constitutes a separate actionable unlawful employment practice. Id. With some employment discrimination claims, "discrete discriminatory acts are not actionable if time barred, even when they are

---

[12] Retaliation claims are analyzed the same under Title VII and the PHRA. Connelly, 809 F.3d at 791 n.9. Accordingly, I will also deny defendant's motion to dismiss plaintiff's PHRA retaliation claim.

[13] The defendant does not dispute that the plaintiff dual filed her EEOC and PHRA administrative complaints on May 23, 2014. (Doc. No. 8-1 at 10).

related to acts alleged in timely filed charges." Morgan, 536 U.S. at 113. With claims involving a constructive discharge, however, "the 'matter alleged to be discriminatory' includes the employee's resignation" and the clock "begins running only after the employee resigns." Green v. Brennan, 136 S. Ct. 1769, 1775 (2016).[14]

In Green, the U.S. Supreme Court granted certiorari to resolve whether, in a claim involving constructive discharge, the limitations period begins to run "after the employer's last discriminatory act" or not "until the employee resigns." Id. at 1775. The Court adopted the latter interpretation. Id. at 1776. Thus, in a claim alleging constructive discharge, the plaintiff properly exhausts administrative remedies by filing an administrative complaint within the applicable time period following the date of the constructive discharge. Id. at 1776–81.

Applying the above principles, it is clear that plaintiff's claims are timely under both Title VII and the PHRA. Plaintiff alleges she was constructively discharged on March 24, 2014. Plaintiff alleges (and defendant does not dispute) that she filed an administrative complaint with the PHRC two months later on May 23, 2014, which was simultaneously cross-filed with the EEOC. In other words, plaintiff filed the required administrative charges approximately 60 days after her alleged constructive discharge. Because plaintiff had 180 and 300 days, respectively, to file her PHRA and EEOC complaints, plaintiff's claims are timely. Green, 136 S. Ct. at 1775–81. Defendant makes the same basic argument that was expressly rejected by the Supreme Court in Green: the

---

[14] Green involved a federal employee, where the applicable statute of limitations was 45 days instead of 180 or 300 days. 136 S. Ct. at 1775–76. Nonetheless, the Court made clear that its analysis applied equally to private plaintiffs' claims where the statute of limitations is 180 or 300 days. Green, 136 S. Ct. at 1775 n.4.

limitations period begins running upon the last alleged discriminatory "act"—not the plaintiff's resignation.[15] In short, plaintiff cross-filed her PHRA and EEOC complaints well within 180 days of the date she was allegedly constructively discharged. Id. Therefore, her discrimination claim is timely.

For all these reasons, I will deny defendant's motion to dismiss plaintiff's discrimination claim on timeliness grounds.

### 2.   Timeliness of the Harassment Claim

As with plaintiff's discrimination claim, plaintiff's harassment claim is also timely.

A hostile work environment claim, which plaintiff alleges here, is one of two types of sexual "harassment" claims available under Title VII. Clayton v. City of Atlantic City, 538 F. App'x 124, 128 (3d Cir. 2013).[16] In some employment discrimination claims, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Morgan, 536 U.S. at 113. A hostile work environment claim is different. Mandel, 706 F.3d at 165 (citing Morgan, 536 U.S. at 105, 115–17). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice' and cannot be said to occur

---

[15] To that end, it is not clear that defendant is even correct about this factual determination. According to defendant, the complaint alleges Ms. Ferrier made her "last" discriminatory comment no later than June 2013. However, the complaint does not reference when any "last" comment was made. Although the complaint alleges plaintiff was formally supervised by Ms. Ferrier until June 2013, it also alleges plaintiff continued to work under Ms. Ferrier and remained in close proximity to her throughout November 2013. Regardless, plaintiff avers she received a letter from defendant on March 24, 2014, threatening to fire her, which could be construed as a discriminatory act since plaintiff complained about Ms. Ferrier prior to receiving this letter.

[16] For purposes of this opinion, the terms "harassment" and "hostile work environment" are interchangeable. Plaintiff does not assert a claim for quid pro quo sexual harassment.

on any particular day." Id. To make out a timely hostile work environment claim, "the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." Id. at 165–66; see also West v. Phila. Elec. Co., 45 F.3d 744, 754–55 (3d Cir. 1995) (plaintiff must show at least one act act occurred within the filing period and that the harassment is "more than the occurrence of isolated or sporadic acts of intentional discrimination").

Here, plaintiff has alleged several relevant acts that occurred within the filing period.[17] For one, plaintiff was separated from her employment in March 2014, which is well within the applicable limitations periods for both Title VII and the PHRA. Plaintiff also alleges that Ms. Ferrier supervised plaintiff until plaintiff's termination. (Compl. ¶ 13). Plaintiff complained to management about being called a "dyke" and otherwise being harassed by Ms. Ferrier. Thus, the fact that Ms. Ferrier remained in supervisory control of plaintiff during the limitations period could constitute a discrete act in itself. Finally, plaintiff received a letter from defendant threatening termination in March 2014. This act, as with the others, occurred during the limitations period and is relevant to plaintiff's harassment claim.

For all these reasons, I will deny defendant's motion to dismiss plaintiff's harassment claim on timeliness grounds.

---

[17] For the PHRA, the applicable period was from late November 2013 until the date of the PHRA charge: May 23, 2014. For Title VII, the applicable period was from late July 2013 until the date of the PHRA charge, which was cross-filed with the EEOC: May 23, 2014.

## V.    CONCLUSION

For all the foregoing reasons, defendant's motion to dismiss is denied.[18]

An appropriate Order follows.

---

[18] I will grant defendant's motion to strike paragraphs 64 and 73 from the complaint. Both these paragraphs state: "As a side, Plaintiff was discriminated against and treated different from persons without mental health condition disabilities including depression and anxiety as Defendant took no further action to keep Plaintiff's employment after her leave of absence." (Doc. No. 1 ¶¶ 64, 73). Pursuant to Federal Rule of Civil Procedure 12(f), "the court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Given that Ms. Ellingsworth has not brought any claim for disability discrimination under the Americans with Disabilities Act (ADA), or any other law, the allegations contained in paragraphs 64 and 73 of the complaint are impertinent. Del. Health Care, Inc. v. MCD Holding Co., 893 F. Supp. 1279, 1291–92 (D. Del. 1995).